**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

# FILED

**AUG 17 2011**

Clerk, U.S District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff | |
| v. | |
| REGAL BELOIT CORPORATION | |
| and | Case: 1:11-cv-01487 |
| | Assigned To : Huvelle, Ellen S. |
| A.O. SMITH CORPORATION | Assign. Date : 8/17/2011 |
| | Description: Antitrust |
| Defendants | |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry

in this civil antitrust proceeding.

## I. NATURE AND PURPOSE OF THE PROCEEDING

Defendants Regal Beloit Corporation ("RBC") and A.O. Smith Corporation ("AOS")

entered into an Asset and Stock Purchase Agreement, dated December 12, 2010.  Pursuant to this

agreement, RBC proposes to acquire AOS's electric motor business, which involves the

manufacture and sale of numerous types of motors, among other related products.  The

transaction is valued at approximately $875 million.

The United States filed a civil antitrust Complaint on August 17, 2011, seeking to enjoin

the proposed acquisition, alleging that it likely would substantially lessen competition in three

separate product markets—electric motors for pool pumps, electric motors for spa pumps, and

draft inducers for furnaces having a thermal efficiency of 90 percent or higher (hereafter referred to as "90+ draft inducers")—in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  For most U.S. customers, RBC and AOS are two of the three leading suppliers of electric motors for pool pumps and electric motors for spa pumps in the United States.  The loss of competition from the acquisition likely would result in RBC's ability unilaterally to raise prices of electric motors for pool pumps and electric motors for spa pumps and would reduce RBC's incentive to invest in innovations for those products.  In addition, RBC is the only supplier of 90+ draft inducers in the United States, and AOS is the only company likely to enter this market.  The elimination of actual potential competition between RBC and AOS likely would result in RBC's ability to continue its monopoly without the threat of a potential entrant.

At the same time the Complaint was filed, the United States filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects that would result from RBC's acquisition of AOS's electric motor business.  Under the proposed Final Judgment, which is explained more fully below, RBC is required to divest assets relating to its electric motors for pool pumps and electric motors for spa pumps, as well as the assets AOS has been using in its effort to enter the market for 90+ draft inducers.  Under the terms of the Hold Separate, RBC will keep its own assets entirely separate from the assets it acquires from AOS until the required divestitures take place.  Pursuant to the Hold Separate, RBC and AOS also must take certain steps to ensure that the assets being divested continue to be operated in a competitively and economically viable manner and that competition for the products being divested is maintained during the pendency of the divestiture.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the Final Judgment and to punish violations thereof.

## II.   DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS

### A.   The Defendants

RBC is incorporated in Wisconsin and has its headquarters in Beloit, Wisconsin. RBC is a manufacturer of mechanical and electrical motion control and power generation products. In 2010, RBC had revenues of approximately $2.2 billion, primarily from its electric products.

AOS is incorporated in Delaware and has its headquarters in Milwaukee, Wisconsin. AOS comprises two operating units: the water products business and the electric motor business. AOS is one of North America's largest manufacturers of electric motors for residential and commercial applications. In 2010, AOS had revenues of approximately $1.5 billion, with approximately $700 million of that amount from electric motors and related products.

### B.   Anticompetitive Effects in the U.S. Markets for Electric Motors for Pool Pumps and Electric Motors for Spa Pumps

#### (1)   Electric Motors for Pool Pumps and Spa Pumps

Electric motors come in a broad range of sizes, horsepower ratings, and end-use segments. Standard frame sizes are determined by both common practice and the National Electrical Mechanical Association. While there is a great deal of overlap between motor size and horsepower, in general, as size increases, horsepower does as well. The smallest electric motors, which generally range in horsepower from 1/400 to one-half, are called subfractional motors. Slightly larger electric motors, which generally range in horsepower from one-half horsepower

to five horsepower, are called fractional motors.  In addition to variations in frame and

horsepower sizes, electric motors are often customized for specific end-use applications.  End-

use categories include water pumps, with specific applications for pumping well water and

wastewater, as well as for use in pools and spas; heating, ventilation, air conditioning, and

refrigeration, with specific applications in air conditioning compressors, fans, furnaces, and

blowers; and general commercial uses, with such diverse applications as garage door openers and

exercise machines.

    For a number of years, manufacturers have been developing more efficient electric

motors.  One of the most innovative technologies being utilized and continually improved for

higher energy efficiency is variable speed technology, which enables the motor to switch

between several speeds, sometimes using integrated electronics and permanent magnet

technology, thereby allowing the motor to run more efficiently.

    Motors sold for use in pool pumps and spa pumps must be uniquely engineered and

assembled to meet the size and performance specifications of the individual pump.  In addition to

size and energy efficiency, specification variables include the capacity of the impeller, the speed,

the current/voltage, whether the motor is operated continually or sporadically, and whether the

pump has more than one speed of operation.

    In light of government regulations, energy costs, and environmental concerns, more

energy-efficient motors, including variable speed motors, are increasingly demanded for pool

and spa applications.  For example, California recently enacted legislation pertaining to the

energy efficiency of pool pumps and spa pumps.  Even without such legislation, energy-efficient

motors are becoming more popular because they use less electricity and, therefore, are less costly

to operate.  Energy-efficient pump motors also produce less noise than standard induction pump

motors.  Pool pumps are an excellent application for the innovative, more energy-efficient motors because pool pumps typically run for many hours a day, sometimes even continuously. Pool pumps are therefore expected to be a high growth area for more energy-efficient electric motors.

All electric motors must pass Underwriters Laboratories ("UL") certification.  UL has established safety standards specifically for all electric motors for pool pumps and all electric motors for spa pumps.  For example, electric motors for pool pumps and motors for spa pumps are the only pump motors that are required to have a ground bonding lug on the outside of the pump, assuring that the pump is electrically grounded.

Electric motors for pool pumps and motors for spa pumps are purchased by manufacturers of pool pumps and spa pumps.  Electric motors for pool pumps and motors for spa pumps are also sold as replacements or upgrades in the aftermarket through the pump manufacturers and distributors.

### (2)  The U.S. Market for Electric Motors for Pool Pumps

Electric motors for pool pumps have specific applications, for which other types of pumps cannot be employed.  Motors for use in other types of pumps, such as sump pumps and spa pumps, cannot be used in pool pumps because each pump is specifically designed for a particular application and the motor is then specifically designed for each pump type.  The motors for the different types of pumps also have different performance characteristics.  A customer who requires a motor for a pool pump cannot substitute a motor for a spa pump, sump pump, or jetted tub pump, or any other kind of motor.

A small but significant increase in the price of electric motors for pool pumps would not cause customers of those motors to substitute a different kind of motor or other product or reduce

purchases of electric motors for pool pumps in volumes sufficient to make such a price increase

unprofitable.  Accordingly, the development, manufacture, and sale of electric motors for pool

pumps is a line of commerce and relevant market within the meaning of Section 7 of the Clayton

Act.

Although electric motors for pool pumps may be manufactured outside the United States,

U.S. purchasers can use only those motors designed for use in the United States.  These motors

must be customized for the demands of U.S. purchasers and must comply with distinct U.S.

technical specifications, such as UL certification.  Manufacturers of electric motors for pool

pumps typically deliver the motors to their customers' locations.  Most customers that purchase

motors for pool pumps for use in the United States are located in the United States.  Major U.S.

customers of electric motors for pool pumps consider only those manufacturers with a substantial

U.S. presence, including sales, technical, and support personnel.  U.S. customers prefer localized

experience, inventory, technical support, and warranty assistance, as well as detailed knowledge

of the U.S. market and products designed to meet U.S. requirements.

A small but significant increase in the price of electric motors for pool pumps intended

for use in the United States would not cause a sufficient number of U.S. customers to turn to

manufacturers of those motors that do not have a substantial presence in the United States so as

to make such a price increase unprofitable.  Accordingly, the United States is a relevant

geographic market within the meaning of Section 7 of the Clayton Act.

### (3)    The U.S. Market for Electric Motors for Spa Pumps

Electric motors for spa pumps also have specific applications, for which other types of

pumps cannot be employed.  Motors for use in other types of pumps, such as sump pumps and

pool pumps, cannot be used in spa pumps because each pump is specifically designed for a

particular application and the motor is then specifically designed for each pump type. The motors for the different types of pumps also have different performance characteristics. A customer who requires a motor for a spa pump cannot substitute a motor for a pool pump, sump pump, or jetted tub pump, or any other kind of motor.

A small but significant increase in the price of electric motors for spa pumps would not cause customers of those motors to substitute a different kind of motor or other product or reduce purchases of electric motors for spa pumps in volumes sufficient to make such a price increase unprofitable. Accordingly, the development, manufacture, and sale of electric motors for spa pumps is a line of commerce and relevant market within the meaning of Section 7 of the Clayton Act.

Electric motors for spa pumps may be manufactured outside the United States; however, these motors must be customized for use in the United States and must comply with distinct U.S. technical specifications, such as UL certification. Manufacturers of electric motors for spa pumps typically deliver the motors to their customers' locations. Most customers that purchase motors for spa pumps for use in the United States are located in the United States. Most U.S. customers of electric motors for spa pumps prefer manufacturers with a substantial U.S. presence, including sales, technical, and support personnel. U.S. customers prefer localized experience, inventory, technical support, and warranty assistance, as well as detailed knowledge of the U.S. market and products designed to meet U.S. requirements.

A small but significant increase in the price of electric motors for spa pumps intended for use in the United States would not cause a sufficient number of U.S. customers to turn to manufacturers of these motors that do not have a substantial presence in the United States so as

to make such a price increase unprofitable.  Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

    **(4)**  **Anticompetitive Effects**

     **(a)**  **Electric Motors for Pool Pumps**

  AOS, RBC, and one other company are the only significant competitors that sell electric motors for pool pumps in the United States.  Currently, AOS and RBC sell approximately 76 and nine percent, respectively, of electric motors for pool pumps in the United States.  The third competitor accounts for most of the remaining sales in this market.  RBC's proposed acquisition of the electric motor business from AOS likely would substantially lessen competition in the U.S. market for electric motors for pool pumps.  If the acquisition is not enjoined, the combined firm would supply approximately 85 percent of the electric motors for pool pumps in the United States.  The Herfindahl-Hirschman Index ("HHI") is a measure of market concentration.  Mergers resulting in highly concentrated markets (with an HHI in excess of 2,500) that cause an increase in the HHI of more than 200 points are presumed to be likely to enhance market power under the *Horizontal Merger Guidelines* issued by the U.S. Department of Justice and the Federal Trade Commission.  Following RBC's acquisition of the electric motor business of AOS, the HHI would increase from approximately 6,000 points to more than 7,500 points.

  AOS's and RBC's bidding behavior often has been constrained by the possibility of losing sales of electric motors for pool pumps to the other.  For many customers of electric motors for pool pumps, AOS and RBC are the two best sources.  Customers have benefited from the competition between AOS and RBC for sales of electric motors for pool pumps by receiving lower prices.  In addition, AOS and RBC have competed vigorously by providing innovations that have resulted in higher-quality and more energy-efficient motors.  For example, AOS and

RBC have competed for the development and sale of more energy-efficient motors for pool pumps. The third competitor is behind AOS and RBC in developing this energy-efficient technology. Further, AOS and RBC compete based on the level of service they provide to their customers. The combination of AOS and RBC would eliminate this competition and its future benefits to customers. Post-acquisition, RBC likely would have the incentive and gain the ability to profitably increase prices, reduce quality, reduce innovation, and provide less customer service.

The response of the only other significant competitor in the United States for electric motors for pool pumps would not be sufficient to constrain a unilateral exercise of market power by RBC post-acquisition. RBC would be aware that many customers strongly prefer it as a supplier, allowing it profitably to raise prices above pre-acquisition levels.

The proposed acquisition, therefore, likely would substantially lessen competition in the United States for the development, manufacture, and sale of electric motors for pool pumps. This likely would lead to higher prices, lower quality, less customer service, and less innovation in violation of Section 7 of the Clayton Act.

### (b)     Electric Motors for Spa Pumps

AOS, RBC, and one other company are the only significant competitors that sell electric motors for spa pumps in the United States. Currently, AOS and RBC each sell a substantial portion of the electric motors for spa pumps in the United States. The third competitor accounts for most of the remaining sales in this market. RBC's proposed acquisition of the electric motor business from AOS likely would substantially lessen competition in the U.S. market for electric motors for spa pumps. If the acquisition is not enjoined, the combined firm would supply well over half of the electric motors for spa pumps in the United States.

AOS's and RBC's bidding behavior often has been constrained by the possibility of losing sales of electric motors for spa pumps to the other. For many customers of motors for spa pumps, AOS and RBC are the two best sources. Customers have benefited from the competition between AOS and RBC for sales of electric motors for spa pumps by receiving lower prices. In addition, AOS and RBC have competed vigorously by providing innovations that have resulted in higher-quality motors. The combination of AOS and RBC would eliminate this competition and its future benefits to customers. Post-acquisition, RBC likely would have the incentive and gain the ability to profitably increase prices, reduce quality, reduce innovation, and provide less customer service.

The response of the only other significant competitor in the United States for electric motors for spa pumps would not be sufficient to constrain a unilateral exercise of market power by RBC post-acquisition. RBC would be aware that many customers strongly prefer it as a supplier, allowing it profitably to raise prices above pre-acquisition levels.

The proposed acquisition, therefore, likely would substantially lessen competition in the United States for the development, manufacture, and sale of electric motors for spa pumps. This likely would lead to higher prices, lower quality, less customer service, and less innovation in violation of Section 7 of the Clayton Act.

  **(5) Entry**

Sufficient, timely entry of additional competitors into the markets for electric motors for pool pumps and electric motors for spa pumps in the United States is unlikely. Therefore, entry or the threat of entry into this market will not prevent the harm to competition caused by the elimination of AOS as a supplier of these products.

Firms attempting to enter into the U.S. market for the development, manufacture, and sale of electric motors for pool pumps and electric motors for spa pumps face several barriers to entry. First, establishing a reputation for successful performance and gaining customer confidence are important and may require many years and substantial sunk costs. Because end users rely on these motors to perform a critical function in their pool pumps and spa pumps, they are reluctant to purchase a product from a supplier not already known for its expertise in electric motors for pool pumps and electric motors for spa pumps, or at least in fractional electric motors.

Second, entry into the markets for electric motors for pool pumps and electric motors for spa pumps could take years. A new supplier must demonstrate to potential customers that its motors can meet the customers' particular design specifications as well as their rigorous quality and performance standards. Because each customer may have many different specifications for the motors, the period for qualification can take up to twelve months with no guarantee of success. This period does not include the time necessary to obtain UL certification, which may take up to six months. Further, because customer specifications are unique, qualification with one customer does not guarantee qualification with another.

Third, the technology and expertise involved in developing and producing electric motors for pool pumps and electric motors for spa pumps is another barrier to entry. A new supplier would need to construct production lines capable of manufacturing motors for pool pumps and motors for spa pumps that meet the standards of potential customers. In addition, the technical know-how necessary to design and successfully manufacture such motors is difficult to obtain. Even incumbent manufacturers of fractional electric motors, with all their expertise and technical know-how, require substantial time and expense for engineering, tooling, and testing a new motor before it can be sold. A new entrant must also be committed to investing in research and

11

development to meet the customers' ongoing desire for innovation, including more energy-efficient motors.

Finally, U.S. customers prefer suppliers that have a substantial U.S. presence, which can require a significant investment in time and money. Given the low volumes of motors needed by manufacturers of pool pumps and spa pumps, new entrants are unlikely to invest in establishing the personnel, inventory, and distribution presence required to compete effectively in the United States.

As a result of these barriers, entry into the markets for electric motors for pool pumps and electric motors for spa pumps in the United States would not be timely, likely, or sufficient to defeat the substantial lessening of competition that likely would result from RBC's acquisition of AOS's electric motor business.

### C.   Anticompetitive Effects of the Acquisition in the U.S. Market for 90+ Draft Inducers

#### (1)   90+ Draft Inducers

Gas-fired furnaces require the movement of air and the expulsion of hot combustion gases. Blowers move the air through ducts and circulate it around a building. Furnace draft inducers are specialized blowers, which perform an important safety function by extracting harmful combustion gases such as carbon monoxide, and venting those gases outside. Furnace draft inducers must meet federal regulatory standards for safety and energy efficiency.

Furnace draft inducers consist of a housing containing a blower wheel and a motor. Furnace draft inducers are distinguished from circulation blowers by the shape of the housing, the need for safety devices to ensure gas is extracted, and the design of the motor mounting on the blower assembly, among other design features. The shapes of the housing and fan blades are among the more difficult design aspects of furnace draft inducers.

Furnaces are classified according to their thermal efficiency, which is the percentage of energy that is used to heat the air and that is not lost with the vented combustion gases. Draft inducers are designed for the specific thermal efficiency of each furnace. Less efficient furnaces, typically referred to as 80 percent thermal efficiency or 80+, use draft inducers that employ an older technology that has been utilized for forty years. More modern furnaces with higher thermal efficiency, typically referred to as 90 percent thermal efficiency or 90+, use draft inducers based on newer, more advanced technology.

Draft inducers for furnaces with 80 percent thermal efficiency (hereafter referred to as "80+ draft inducers") are used in non-condensing furnaces. Non-condensing furnaces do not need the draft inducer to drain condensation. 80+ draft inducers are generally simpler and easier to design than 90+ draft inducers because they have a single inlet, a sheet metal housing that is easily available, and a narrow, forward-curved wheel.

90+ draft inducers are used in condensing furnaces. Condensing furnaces take so much heat out of the combusted gases (that is, turn so much of the combustion energy into heat that is circulated) that condensation forms in the draft inducer. This necessitates a draft inducer with a plastic housing that is made from polycarbonate material, rather than metal, which can corrode, and a drain for the condensation. 90+ draft inducers also contain a more technically complicated "swirl fan" and backward-curved wheel, which is inclined for greater efficiency and noise reduction. 90+ draft inducers are priced significantly higher than 80+ draft inducers. Currently, sales of 90+ draft inducers represent the majority of the draft inducer sales in the United States. Usage of 90+ draft inducers is likely to increase as federal regulations requiring the use of more energy-efficient products likely will lead to the removal of furnaces with 80 percent thermal efficiency from the market.

### (2)     The U.S. Market for 90+ Draft Inducers

90+ draft inducers have specific applications, for which other products cannot be employed.  Every furnace needs a draft inducer, and no product other than a draft inducer can extract the harmful combustion gases from the furnace and safely vent them.  In addition, 80+ draft inducers, or other draft inducers designed for less efficient furnaces, cannot be substituted for a 90+ draft inducer.  Draft inducers for less efficient furnaces will not work with a furnace with 90 percent thermal efficiency.  Draft inducers are also used to vent hazardous gases created in other gas appliances.  Although performing a similar function as furnace draft inducers, the frame shape, wheel design, motor, and other design features of a draft inducer intended for another appliance are sufficiently distinct that they cannot be used in a furnace.

A small but significant increase in the price of 90+ draft inducers would not cause customers of 90+ draft inducers to substitute a lower-efficiency draft inducer, such as an 80+ draft inducer, or another product or to reduce purchases of 90+ draft inducers in volumes sufficient to make such a price increase unprofitable.  Accordingly, the development, manufacture, and sale of 90+ draft inducers is a line of commerce and relevant market within the meaning of Section 7 of the Clayton Act.

90+ draft inducers sold in the United States must be customized for the demands of U.S. purchasers and must comply with distinct U.S. technical specifications and certification requirements.  Manufacturers of 90+ draft inducers typically deliver the products to their customers' locations.  90+ draft inducers are used only in the United States and Canada. Customers that purchase 90+ draft inducers for use in the United States are located in the United States.  Major U.S. customers of 90+ draft inducers consider only those manufacturers with a significant understanding of heating systems in the United States.  Those manufacturers all have

a substantial presence in the United States, including sales, technical, and support personnel. U.S. customers also prefer localized experience, inventory, and technical support, as well as detailed knowledge of the U.S. market.

A small but significant increase in the price of 90+ draft inducers would not cause a sufficient number of customers in the United States to turn to manufacturers of 90+ draft inducers without a presence in the United States so as to make such a price increase unprofitable. Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

### (3)    Anticompetitive Effects

For the past several years, RBC has been the only firm selling 90+ draft inducers in the United States. Furnace manufacturers have attempted to find alternative sources for 90+ draft inducers. For at least one year, AOS has been attempting to enter the U.S. market for 90+ draft inducers. AOS has the means to enter this market and has advantages over other manufacturers that make it a particularly strong and likely entrant.

While AOS is not currently manufacturing and selling 90+ draft inducers, it is one of the few manufacturers in the United States that likely would have the ability to enter the 90+ draft inducer market. RBC and AOS are the only manufacturers of water heater draft inducers in the United States. While water heater draft inducers are distinct from 90+ draft inducers, AOS's technology, experience, and know-how relating to the development of water heater draft inducers provided AOS with some technical knowledge necessary to begin developing a 90+ draft inducer that would not infringe numerous RBC patents relating to the 90+ draft inducer. Until the announcement of RBC's proposed acquisition of the electric motor business of AOS, AOS engaged in 90+ draft inducer development projects with three furnace manufacturers and had

sent samples of its product to one of these manufacturers. These furnace manufacturers viewed AOS as presenting the only opportunity to develop an alternative to RBC for 90+ draft inducers. Accordingly, AOS was the firm best positioned to challenge RBC's dominance in the 90+ draft inducer market in the United States.

One company that sells 80+ draft inducers to U.S. customers is attempting to develop a 90+ draft inducer. However, its efforts have been unsuccessful and most furnace manufacturers do not consider this company to be close to success in developing a 90+ draft inducer.

AOS's entry into the U.S. market for 90+ draft inducers likely would have benefited customers with lower prices, more innovation, and more favorable terms of service. AOS may have become an alternative to RBC for the supply of 90+ draft inducers. RBC's acquisition of the electric motor business of AOS would prevent AOS's entry and, therefore, substantially lessen competition in the market for 90+ draft inducers, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**(4)    Entry**

Sufficient, timely entry of additional competitors into the market for 90+ draft inducers in the United States is unlikely. Therefore, entry or the threat of entry into this market is not likely to prevent the harm to competition caused by the elimination of AOS as a potential supplier of 90+ draft inducers.

Firms attempting to enter the U.S. market for the development, manufacture, and sale of 90+ draft inducers face several barriers to entry. First, a new supplier of 90+ draft inducers must be certified as a supplier by the furnace manufacturer and must work with that manufacturer to customize the draft inducer specifically for the manufacturer's furnace. This is a rigorous and lengthy process, often involving many redesigns of the product, and can take two years or longer.

This process involves, among other things, reaching an agreement by the furnace manufacturer and the draft inducer supplier on the specifications for the draft inducer, the design of the draft inducer and each subcomponent to meet these specifications, and the laboratory and field testing of the subcomponents and the assembled 90+ draft inducer.

Second, draft inducer suppliers must have an established reputation for the reliability of their products and the capacity to timely supply them in sufficient quantities. Because draft inducers perform a critical function in the furnace, furnace manufacturers are reluctant to purchase a product from a supplier that is not already known for its expertise in the product area.

Third, a firm attempting to develop a 90+ draft inducer must have the technology and know-how to design a draft inducer that avoids infringing on the numerous RBC patents relating to 90+ draft inducers. Those few motor or blower manufacturers in the heating industry that have reputations for quality products and the capacity to supply motors, blowers, and other heating system components have experienced difficulties in their attempts to develop a 90+ draft inducer that would be competitive in price, quality, and the capacity to supply them.

As a result of these barriers, entry into the market for 90+ draft inducers in the United States would not be timely, likely, or sufficient to defeat the substantial lessening of competition that would result from RBC's acquisition of AOS's electric motor business.

III.   **EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

The divestitures required by the proposed Final Judgment will eliminate the anticompetitive effects that likely would result from RBC's acquisition of AOS's electric motor business. These divestitures will preserve the current state of competition in the development, manufacture, and sale of electric motors for pool pumps and electric motors for spa pumps. These divestitures will also preserve the potential competition that currently exists in the market

17

for the design and development of 90+ draft inducers.  The divestiture of the pool pump and spa pump motor assets will create an independent, economically viable competitor to RBC in the United States for electric motors for pool pumps and electric motors for spa pumps.  The divestiture of the draft inducer assets will create an independent, economically viable company that can continue AOS's developmental work on the 90+ draft inducers and create the potential for competition in that market.

(A)     **Electric Motors for Pool Pumps and Spa Pumps**

The divested pool pump and spa pump motor assets will provide the acquirer with the assets it needs to successfully develop, manufacture, and sell electric motors for pool pumps and electric motors for spa pumps in the United States.  The proposed Final Judgment requires RBC to divest the assets used to design, develop, manufacture, market, service, distribute, or sell the RBC motors used in pool pump and spa pump applications, including but not limited to single-speed motors, two-speed motors, three-speed motors, the imPower motors, variable-speed motors, and electronically commutated motors.  The tangible assets being divested include manufacturing equipment, tooling, dies, prototypes, drawings, bills of material, contracts, specifications, and repair and performance records.  The intangible assets being divested are those assets used exclusively or primarily to design, develop, manufacture, market, service, distribute, or sell the RBC motors used in pool pump and spa pump applications, including patents, intellectual property, know-how, product designs, marketing and sales data, and research and development efforts.  In addition, the acquirer of the pool pump and spa pump motor assets will be granted a non-exclusive, perpetual, worldwide, non-transferrable,[1] royalty-free license for any intangible assets that were used to design, develop, manufacture, market, service, distribute,

---

[1]     However, the license is transferrable to any future purchaser of substantially all of the pool pump and spa pump motor assets.

or sell any of the RBC motors used in pool pump and spa pump applications that are being

divested, but that were not used exclusively or primarily for those motors.  The divestiture assets

exclude certain trademarks and trade names, but the acquirer will be able to use the majority of

those trademarks and trade names for one year.  Finally, the divestiture assets exclude all assets

used by three named RBC subsidiaries located outside the United States, unless those assets

have, prior to the time the Court signs the Hold Separate, been used to design, develop,

manufacture, market, service, distribute, or sell motors that are designed or developed for use or

sale in, or are otherwise intended to be used or sold in, the United States for pool pump or spa

pump applications.

The proposed Final Judgment designates SNTech, Inc. as the company to which the

divested pool pump and spa pump motor assets must be sold.  The United States determined,

after a thorough investigation, that SNTech has the incentive and capability to develop,

manufacture, and sell the pool pump and spa pump motors that are being divested.  The United

States does not typically require that the acquirer of the divested assets be identified and

approved prior to the filing of the proposed Final Judgment.  However, identifying an upfront

acquirer was useful in this case because the assets being divested do not constitute a full business

unit.  An upfront acquirer provided the United States assurances that the divestiture assets were

sufficient to make the acquirer a viable competitor and that there would be an acceptable

acquirer with the means and incentive to use the divested assets to compete with RBC.[2]

---

[2]     The United States did not include an alternative relief proposal for the pump motor assets
in the proposed Final Judgment because RBC has a binding agreement with SNTech to acquire
those assets.  RBC and SNTech are prepared to close their acquisition immediately after the
close of RBC's acquisition of AOS's electric motor business.  In addition, if a trustee must effect
the divestiture of the Pump Motor Divestiture Assets, those assets would be sufficient to allow an
acquirer other than SN Tech to become a viable competitor in the markets for motors for pool
pumps and motors for spa pumps.

The United States typically requires that assets be divested within 60 to 90 days after the filing of the Complaint or five days after the entry of the Final Judgment by the Court. Because the acquirer of the divested assets has been approved by the United States prior to the filing of the Complaint, there is no need for time to engage in a search for an acquirer. Accordingly, the proposed Final Judgment requires that the divested assets be sold to SNTech within ten days after the Court signs the Hold Separate. The date of entry of the Hold Separate was chosen as the date upon which the divestiture period begins to run because RBC cannot consummate its acquisition of AOS's electric motor business until the Court enters the Hold Separate, and that acquisition must be consummated before the divested assets are sold.

The Hold Separate requires that until the assets being divested are sold according to the terms of the proposed Final Judgment, RBC will preserve and continue to operate its own assets and the assets it acquires from AOS as independent, ongoing, and economically viable businesses that are held entirely separate, distinct, and apart. RBC shall not coordinate the production, marketing, or terms of sale of its assets with the assets it acquires from AOS until the assets being divested are sold.

Because SNTech is purchasing equipment and other assets that must be moved and integrated into its existing operations, it will need RBC's assistance to enable it to supply the divested motors to customers as soon as the divestiture is consummated. Therefore, the proposed Final Judgment requires that RBC enter into a transition services agreement by which RBC will provide technical and engineering assistance to SNTech for one year. This agreement also requires that RBC provide sufficient assistance to permit SNTech to develop the next generation of imPower motors, referred to as the imPower 2.6 horsepower pool pump motor.

In addition, the proposed Final Judgment requires that RBC enter into a supply agreement to provide SNTech with the divested motors so that it may supply its customers prior to and while the equipment and other assets are being moved, installed, and tested. The proposed Final Judgment limits the term of this supply agreement to six months, with the possibility of extensions up to an additional six months with the United States's approval. The proposed Final Judgment further requires that RBC enter into a supply agreement to provide SNTech raw materials and components necessary to produce the divested motors. The term of this supply agreement is limited to one year, with the possibility of extensions up to an additional six months with the United States's approval. The proposed Final Judgment requires that RBC establish procedures to prevent the disclosure of certain information, including quantities and pricing, about SNTech's purchases under the supply agreements to any RBC employee responsible for marketing, distributing, or selling electric motors for pool pumps or spa pumps in competition with SNTech. The proposed Final Judgment requires RBC to submit its proposed procedures to the United States for its approval or rejection.

Finally, the proposed Final Judgment contains a provision that ensures that RBC will not compete directly or indirectly with SNTech in the markets for pool pump and spa pump motors in the United States using any intangible assets RBC is divesting, licensing, or retaining. This provision is necessary to ensure that RBC does not use the assets it is retaining (such as assets used to manufacture pool pump motors and spa pump motors outside the United States) or divesting (such as know-how for its imPower motors) to manufacture pool pump motors or spa pump motors that can be used in the United States, even if those motors are sold outside the United States. For example, it prevents RBC from selling RBC pool pump motors and spa pump motors into the United States indirectly by selling those motors to overseas pump manufacturers

for export into the United States.  RBC will compete with SNTech in the U.S. markets for pool pump and spa pump motors using the assets it acquires from AOS.  First, this provision prevents RBC from using the intangible assets that are being divested or licensed (such as know-how) to design, develop, manufacture, market, service, distribute, or sell any motors for use in pool pump or spa pump applications.  Second, it prohibits RBC from using any assets used for pool pump and spa pump motor applications that RBC is retaining to design, develop, manufacture, market, service, distribute, or sell any motors that are designed or developed for use or sale in, or otherwise intended to be used and/or sold in, pool pump or spa pump applications in the United States, regardless of where those motors are actually delivered or sold.  Third, this provision prohibits RBC from using the technology, intellectual property, and know-how that it uses for its imPulse spa motors (which are excluded from the divestiture) to design, develop, manufacture, market, service, distribute, or sell any motors for pool pump applications.

### (B)    90+ Draft Inducers

The acquirer of the draft inducer assets will obtain the assets it needs to replace the potential competition in the market for 90+ draft inducers that will be lost as a result of RBC's acquisition of AOS's electric motor business.  The proposed Final Judgment requires RBC to divest the assets that are necessary for the acquirer to continue AOS's development work on its 90+ draft inducers.  The tangible assets being divested are those used exclusively or primarily to design, develop, manufacture, market, or sell AOS's 90+ draft inducers, including prototypes, drawings, specifications, records, customer agreements, teaming agreements, and test data.  The intangible assets being divested are those used exclusively or primarily to design, develop, manufacture, market, or sell AOS's 90+ draft inducers, including intellectual property, technical information, know-how, trade secrets, design protocols, and research and development efforts.

In addition, the intangible assets being divested include the patents, drawings, product designs, packaging designs, marketing and sales data, and quality assurance and control procedures that are used to design, develop, manufacture, market, or sell AOS's 90+ draft inducers.

The proposed Final Judgment designates Revcor, Inc. as the company to which the draft inducer assets must be sold.[3]  The United States determined, after a thorough investigation, that Revcor's expertise in air moving products, previous experience with draft inducers, and prior developmental efforts in conjunction with AOS demonstrate that Revcor can and will attempt to design, develop, and sell 90+ draft inducers in competition with RBC.  The circumstances of this divestiture also are unique because the assets being divested are those used in AOS's developmental efforts and have not been used to manufacture or sell 90+ draft inducers. Therefore, the United States insisted that the acquirer of the draft inducer assets be identified and approved prior to settlement.  Because the number of potential acquirers that could utilize the draft inducer assets would likely be limited, the United States wanted assurances that the acquirer would have the incentive and ability to use the assets and that the package of assets being transferred was sufficient to continue AOS's developmental efforts.

Because the acquirer of the draft inducer assets has been approved by the United States, there is no need for an extended time period for the divestiture.  Accordingly, the proposed Final Judgment requires that the divested assets be sold to Revcor within ten days after the Court signs the Hold Separate.

---

[3]     The United States did not include an alternative relief proposal for the draft inducer assets in the proposed Final Judgment because RBC has a binding agreement with Revcor to acquire those assets.  RBC and Revcor are prepared to close their acquisition immediately after the close of RBC's acquisition of AOS's electric motor business.  In addition, if a trustee must effect the divestiture of the Draft Inducer Divestiture Assets, those assets would be sufficient to allow an acquirer other than Revcor to become a viable competitor in the market for 90+ draft inducers.

Finally, because Revcor is acquiring primarily intangible assets that will be used to develop a 90+ draft inducer, it may need engineering and other assistance from RBC. Therefore, the proposed Final Judgment requires that RBC enter into a transition services agreement by which RBC will provide such assistance to Revcor for one year.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR
## MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period

will be considered by the United States Department of Justice, which remains free to withdraw

its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.

The comments and the response of the United States will be filed with the Court and published in

the *Federal Register*.  Written comments should be submitted to:

> Maribeth Petrizzi
> Chief, Litigation II Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, N.W., Suite 8700
> Washington, D.C.  20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action

and the parties may apply to the Court for any order necessary or appropriate for the

modification, interpretation, or enforcement of the Final Judgment.

## VI.      ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full

trial on the merits against Defendants.  The United States could have continued the litigation and

sought preliminary and permanent injunctions preventing RBC's acquisition of AOS's electric

motor business.  The United States is satisfied, however, that the divestiture of the assets

described in the proposed Final Judgment will preserve competition for the development,

manufacture, and sale of electric motors for pool pumps and electric motors for spa pumps in the

United States.  The United States also is satisfied that the divestiture of the assets described in

the proposed Final Judgment will preserve the potential competition for the design and

development of 90+ draft inducers in the United States.  Thus, the proposed Final Judgment

would achieve all or substantially all of the relief the United States would have obtained through

litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the

Complaint.

## VII.   STANDARD OF REVIEW UNDER THE
## APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination in accordance with the statute, the court is required to consider:

(A)   the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)   the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A)-(B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR), at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable.").

As the United States Court of Appeals for the District of Columbia has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[4] In determining whether a proposed settlement is in the public interest, the court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's

---

[4]    *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case); *United States v. Republic Serv., Inc.*, 2010-2 Trade Cas. (CCH) ¶ 77,097, 2010 U.S. Dist. LEXIS 70895, No. 08-2076 (RWR), at *10 (D.D.C. July 15, 2010) (finding that "[i]n light of the deferential review to which the government's proposed remedy is accorded, [amicus curiae's] argument that an alternative remedy may be comparably superior, even if true, is not a sufficient basis for finding that the proposed final judgment is not in the public interest.").

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).  Therefore, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *Republic Serv.*, 2010 U.S. Dist. LEXIS 70895, at *2-3 (entering final judgment "[b]ecause there is an adequate factual foundation upon which to conclude that the government's proposed divestitures will remedy the antitrust violations alleged in the complaint.").

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As this Court confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." 489 F. Supp. 2d at 15.

In its 2004 amendments to the Tunney Act,[5] Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, stating: "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through

---

[5] The 2004 amendments substituted the word "shall" for "may" when directing the courts to consider the enumerated factors and amended the list of factors to focus on competitive considerations and address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).

Rather, the procedure for the public interest determination is left to the discretion of the court,

with the recognition that the court's "scope of review remains sharply proscribed by precedent

and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[6]

## VIII.   **DETERMINATIVE DOCUMENTS**

There are no determinative materials or documents within the meaning of the APPA that

were considered by the United States in formulating the proposed Final Judgment.

Dated:  August 17, 2011                              Respectfully submitted,

Christine A. Hill (D.C. Bar No. 461048)
U.S. Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street, N.W., Suite 8700
Washington, D.C.  20530
(202) 305-2738

---

[6]      *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v  Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

## CERTIFICATE OF SERVICE

I, Christine A. Hill, hereby certify that on August 17, 2011, I caused a copy of the

foregoing Competitive Impact Statement, as well as the Complaint, Hold Separate Stipulation

and Order, and Explanation of Consent Decree Procedures filed in this matter, to be served upon

Defendants Regal Beloit Corporation and A.O. Smith Corporation by mailing the documents

electronically to the duly authorized legal representatives of Defendants as follows:

**Counsel for Regal Beloit Corporation:**

Howard Fogt
Alan Rutenberg
Melinda Levitt
Foley & Lardner LLP
3000 K Street, N.W., Suite 600
Washington, D.C. 20007
hfogt@foley.com
arutenburg@foley.com
mlevitt@foley.com

**Counsel for A.O. Smith Corporation**

Sean F.X. Boland
James Kress
Baker Botts LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
sean.boland@bakerbotts.com
james.kress@bakerbotts.com

Christine A. Hill, Esquire
United States Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street, N.W., Suite 8700
Washington, D.C. 20530
(202) 305-2738