## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff | |
| v. | Case No. 1:11-cv-01487-ESH |
| REGAL BELOIT CORPORATION | Judge Ellen S. Huvelle |
| and | |
| A.O. SMITH CORPORATION | |
| Defendants | |

## <u>FINAL JUDGMENT</u>

WHEREAS, Plaintiff, United States of America, filed its Complaint on August 17, 2011, and the United States and Defendants, Regal Beloit Corporation ("RBC") and A.O. Smith Corporation ("AOS"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by RBC to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires RBC to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.  <u>JURISDICTION</u>

This Court has jurisdiction over the subject matter of and each of the parties to this action.  The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended.

## II.  <u>DEFINITIONS</u>

As used in this Final Judgment:

A.      "RBC" means Defendant Regal Beloit Corporation, a Wisconsin corporation with its headquarters in Beloit, Wisconsin, its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

B.      "AOS" means Defendant A.O. Smith Corporation, a Delaware corporation with its headquarters in Milwaukee, Wisconsin, its successors, assigns, subsidiaries, divisions, groups,

affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "Acquirer of the Pump Motor Divestiture Assets" means SNTech, the entity to which RBC divests the Pump Motor Divestiture Assets.

D.    "Acquirer of the Draft Inducer Divestiture Assets" means Revcor, the entity to which RBC divests the Draft Inducer Divestiture Assets.

E.    "SNTech" means SNTech, Inc., a Delaware corporation with its headquarters in Phoenix, Arizona, its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

F.    "Revcor" means Revcor, Inc., an Illinois corporation with its headquarters in Carpentersville, Illinois, its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

G.    "Divested RBC Product Lines" means all motors smaller than NEMA 140 frame that, as of the date the Court signs the Hold Separate Stipulation and Order in this matter, are being designed, developed, manufactured, marketed, distributed, and/or sold by or for RBC for use in pool pump and/or spa pump applications, including, but not limited to, single-speed motors, two-speed motors, three-speed motors, the imPower motors, variable speed motors, and electronically commutated motors.  However, the Divested RBC Product Lines shall exclude RBC's imPulse motors; RBC's imPower motors that, as of the date the Court signs the Hold Separate Stipulation and Order in this matter, have been or are being designed or developed for use and/or sale, and are intended to be used and/or sold, solely outside of the United States; and all motors that, as of the date the Court signs the Hold Separate Stipulation and Order in this

3

matter, are being designed, developed, manufactured, marketed, distributed, and/or sold by or for AOS.

      H.    "Divested AOS Product Line" means all AOS draft inducers that, as of the date the Court signs the Hold Separate Stipulation and Order in this matter, are being marketed to furnace manufacturers and/or are being designed and/or developed for use in furnaces having a thermal efficiency of 90 percent or greater.

      I.    "Pump Motor Divestiture Assets" means:

      (1)    All tangible assets that are used to design, develop, manufacture, market, service, distribute, and/or sell any of the Divested RBC Product Lines, including, but not limited to, manufacturing equipment, machining, tooling, dies, prototypes, models, drawings, blueprints, bills of material, specifications, inventory, supplies, customer lists, contracts, agreements, accounts, credit records, teaming arrangements, leases, commitments, manuals, licenses, permits, authorizations, and repair and performance records.

      (2)    All intangible assets used exclusively or primarily to design, develop, manufacture, market, service, distribute, and/or sell any of the Divested RBC Product Lines, including, but not limited to, research and development activities, patents, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, product designs, packaging designs, design protocols, safety procedures, marketing and sales data, quality assurance and control procedures, design tools and simulation capabilities, technical information RBC provides to its own employees, customers, suppliers, agents, or licensees, and data concerning historic and current research and development efforts relating to the Divested RBC

Product Lines, including, but not limited to, designs and experiments, the results of such designs and experiments, testing protocols, and the results of product testing.

(3)     With respect to any intangible assets used to design, develop, manufacture, market, service, distribute, and/or sell any of the Divested RBC Product Lines that are not included in paragraph II(I)(2), above, and that prior to the filing of the Complaint in this matter were used to design, develop, manufacture, market, service, distribute, and/or sell any of the Divested RBC Product Lines and any other RBC product, a non-exclusive, perpetual, worldwide, non-transferrable, royalty-free license for such intangible assets to be used for the design, development, manufacture, marketing, servicing, distribution, and/or sale of any of the Divested RBC Product Lines; provided, however, that any such license is transferrable to any future purchaser of substantially all of the Pump Motor Divestiture Assets.  Any improvements or modifications to these intangible assets developed by the Acquirer of the Pump Motor Divestiture Assets shall be owned solely by that acquirer.

The Pump Motor Divestiture Assets shall exclude the trademarks, trade names, service marks, or service names "Regal Beloit," "Marathon," "Leeson," "FASCO," "imPower," and "imPulse," or any internet domain names.  However, for the sole and limited purpose of marketing, distributing, servicing, and/or selling any of the Divested RBC Product Lines, RBC shall grant the Acquirer of the Pump Motor Divestiture Assets a worldwide and royalty-free license to use the trademarks, trade names, service marks, or service names "Marathon," "Leeson," "FASCO," "imPower," and the internet domain names impowerdealer.com and pumpmotors.com for a period of one year from the date the Pump Motor Divestiture Assets are divested to the Acquirer of the Pump Motor Divestiture Assets.

5

The Pump Motor Divestiture Assets shall exclude those assets used by FASCO Australia Pty, Ltd., FASCO Motors Thailand, and CMG Engineering Group Pty, Ltd., and the subsidiaries of each of these entities, unless those assets have, prior to the time the Court signs the Hold Separate Stipulation and Order in this matter, been used in any way to design, develop, manufacture, market, service, distribute, and/or sell motors smaller than NEMA 140 frame that are designed or developed for use and/or sale in, or are otherwise intended to be used and/or sold in, the United States for pool pump and/or spa pump applications.

J.      "Draft Inducer Divestiture Assets" means:

(1)      All tangible assets that are used exclusively or primarily to design, develop, manufacture, market, and/or sell the Divested AOS Product Line, including, but not limited to, drawings, specifications, tooling, dies, models, prototypes, records, customer agreements, teaming agreements, and test data.

(2)      The following intangible assets that are used to design, develop, manufacture, market, and/or sell the Divested AOS Product Line:  patents, drawings, product designs, packaging designs, marketing and sales data, and quality assurance and control procedures.

(3)      All intangible assets that are used exclusively or primarily to design, develop, manufacture, market, and/or sell the Divested AOS Product Line, including, but not limited to, research and development activities, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, know-how, trade secrets, design protocols, and data concerning historic and current research and development efforts relating to the Divested AOS Product Line, including, but not limited to, designs and

experiments, the results of such designs and experiments, testing protocols, and the results of product testing.

## III.   <u>APPLICABILITY</u>

This Final Judgment applies to RBC and AOS, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

## IV.   <u>DIVESTITURES</u>

A.     RBC is ordered and directed, within ten calendar days after the Court signs the Hold Separate Stipulation and Order in this matter, to divest the Pump Motor Divestiture Assets to the Acquirer of the Pump Motor Divestiture Assets and to divest the Draft Inducer Divestiture Assets to the Acquirer of the Draft Inducer Divestiture Assets in a manner consistent with this Final Judgment.

B.     Defendants shall not interfere with any negotiations by the Acquirer of the Pump Motor Divestiture Assets to employ any:  (1) current or former RBC employee who has been, at any time during the two years prior to the date the Court signs the Hold Separate Stipulation and Order in this matter, responsible for the design, development, manufacture, marketing, servicing, distribution, and/or sale of any of the Divested RBC Product Lines that are designed or developed for use in, or are otherwise intended to be used in, the United States for pool pump and/or spa pump applications for at least 50 percent of his or her time during any three month period; (2) RBC employees with the following titles who have, at any time during the two years prior to the date the Court signs the Hold Separate Stipulation and Order in this matter, devoted 20 percent or more of his or her time during any three month period to the design, development,

manufacture, marketing, servicing, distribution, and/or sale of any of the Divested RBC Product

Lines that are designed or developed for use in, or are otherwise intended to be used in, the

United States for pool pump and/or spa pump applications:  Pump Product Manager, Customer

Service Leader, Product Service Engineer, Senior Application Engineer – Pump, New Product

Development Project Leader, Electronics Design Engineer, Software Engineer, Mechanical

Design Manager, Electrical Design Manager, Mechanical Design Engineer, Laboratory

Technician, Agency/Compliance Engineer, Variable Speed Team Leader, and Production

Leading Hand; and (3) employee of RBC's CASA facility in Juarez, Mexico who has worked in

any way on any of the Divested RBC Product Lines at any time during one year prior to the date

the Court signs the Hold Separate Stipulation and Order in this matter.  Defendants will not

interfere with any negotiations by the Acquirer of the Draft Inducer Divestiture Assets to employ

any current or former AOS employee who was, at any time during one year prior to the date the

Court signs the Hold Separate Stipulation and Order in this matter, primarily responsible for the

design, development, manufacture, marketing, and/or sale of the Divested AOS Product Line as

well as the Lead Engineer, Blower Products, of AOS's Electrical Products Company.

Interference with respect to this paragraph includes, but is not limited to, enforcement of non-

compete clauses and offers to increase salary or other benefits apart from those offered company-

wide.

   C.  RBC shall warrant to the Acquirer of the Pump Motor Divestiture Assets that the

tangible Pump Motor Divestiture Assets will be operational on the date of sale.

D.      RBC shall not take any action that will impede in any way the operation, use, or divestiture of the Pump Motor Divestiture Assets.  Defendants shall not take any action that will impede in any way the use or divestiture of the Draft Inducer Divestiture Assets.

E.      RBC shall not design, develop, manufacture, market, service, distribute, and/or sell any motors smaller than NEMA 140 frame for use in pool pump or spa pump applications using any intangible assets divested or licensed (except trademarks, trade names, service marks, service names, or internet domain names) pursuant to paragraph II(I) of this Final Judgment.  In addition, RBC shall not design, develop, manufacture, market, service, distribute, and/or sell any motors smaller than NEMA 140 frame that are designed or developed for use and/or sale in, or otherwise intended to be used and/or sold in, pool pump or spa pump applications in the United States, regardless of where those motors are actually delivered and/or sold, using any assets that are specifically excluded (except trademarks, trade names, service marks, service names, or internet domain names) from the definition of Pump Motor Divestiture Assets in paragraph II(I) of this Final Judgment.  Further, RBC shall not design, develop, manufacture, market, service, distribute, and/or sell any motors smaller than NEMA 140 frame that are designed or developed for use and/or sale in, or otherwise intended to be used and/or sold in, pool pump applications utilizing the technology, intellectual property, and/or know-how that is used in the design, development, and/or manufacture of RBC's imPulse motor.

F.      RBC shall enter into a transition services agreement with the Acquirer of the Pump Motor Divestiture Assets for a period of one year.  This agreement shall include technical and engineering assistance relating to motors for pool pump and spa pump applications.  This agreement shall also include sufficient assistance to provide the Acquirer of the Pump Motor

Divestiture Assets the ability to develop the imPower 2.6 horsepower pool pump motor.  The terms and conditions of any contractual arrangement meant to satisfy this provision must be commercially reasonable.

G.      RBC shall enter into a transition services agreement with the Acquirer of the Draft Inducer Divestiture Assets for a period of one year.  This agreement shall include technical and engineering assistance relating to draft inducers for furnaces having a thermal efficiency of 90 percent or greater.  The terms and conditions of any contractual arrangement meant to satisfy this provision must be commercially reasonable.

H.      RBC shall enter into a supply agreement to supply the Divested RBC Product Lines to the Acquirer of the Pump Motor Divestiture Assets in quantities and at prices agreed to between RBC and the Acquirer of the Pump Motor Divestiture Assets.  The duration of this supply agreement shall not be longer than six months.  Subject to written approval by the United States, in its sole discretion, at the option of the Acquirer of the Pump Motor Divestiture Assets, RBC shall agree to one or more extensions of this agreement, so long as such extensions do not total more than six months in duration.  The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.

I.      RBC shall enter into a supply agreement to supply raw materials and/or motor components used in the design, development, and/or manufacture of the Divested RBC Product Lines sufficient to meet all or part of the needs of the Acquirer of the Pump Motor Divestiture Assets.  The duration of this supply agreement shall not be longer than one year.  Subject to written approval by the United States, in its sole discretion, at the option of the Acquirer of the Pump Motor Divestiture Assets, RBC shall agree to one or more extensions of this agreement, so

10

long as such extensions do not total more than six months in duration.  The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.

J.      During the terms of the supply agreements discussed in paragraphs IV(H) and IV(I) of this Final Judgment, RBC shall establish, implement, and maintain procedures and take such other steps that are reasonably necessary to prevent the disclosure of the quantities of motors, materials, and components ordered or purchased from RBC by the Acquirer of the Pump Motor Divestiture Assets, the prices paid by the Acquirer of the Pump Motor Divestiture Assets, and any other competitively sensitive information regarding the performance of RBC or the Acquirer of the Pump Motor Divestiture Assets under these supply agreements, to any employee of RBC that has responsibility for marketing, distributing, and/or selling motors for pool pump and/or spa pump applications in competition with the Acquirer of the Pump Motor Divestiture Assets.  RBC shall, within thirty days after the Court signs the Hold Separate Stipulation and Order in this matter, submit to the United States Department of Justice, Antitrust Division ("Antitrust Division") a document setting forth in detail the procedures implemented to effect compliance with this paragraph.  The Antitrust Division shall notify RBC within ten days whether it approves of or rejects RBC's compliance plan, in its sole discretion.  In the event that RBC's compliance plan is rejected, the reasons for the rejection shall be provided to RBC and RBC shall submit, within ten days of receiving the notice of rejection, a revised compliance plan. If RBC and the Antitrust Division cannot agree on a compliance plan, the Antitrust Division shall have the right to request that the Court rule on whether RBC's proposed compliance plan is reasonable.

K.     Unless the United States otherwise consents in writing, the divestiture of the Pump Motor Divestiture Assets shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Pump Motor Divestiture Assets can and will be used by the Acquirer of the Pump Motor Divestiture Assets as part of a viable, ongoing business that is engaged in the design, development, manufacture, marketing, servicing, distribution, and sale of the Divested RBC Product Lines and the divestiture of the Pump Motor Divestiture Assets will remedy the competitive harm alleged in the Complaint.  The divestiture of the Pump Motor Divestiture Assets shall be made to an acquirer that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) of competing effectively in the design, development, manufacture, marketing, servicing, distribution, and sale of the Divested RBC Product Lines.  The divestiture of the Pump Motor Divestiture Assets shall be accomplished so as to satisfy the United States, in its sole discretion, that the terms of any agreement between the Acquirer of the Pump Motor Divestiture Assets and RBC do not give RBC the ability unreasonably to raise that acquirer's costs, to lower that acquirer's efficiency, or otherwise to interfere in the ability of that acquirer to compete effectively.

L.     Unless the United States otherwise consents in writing, the divestiture of the Draft Inducer Divestiture Assets shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Acquirer of the Draft Inducer Divestiture Assets can and will attempt to use the Draft Inducer Divestiture Assets to design, develop, and sell draft inducers for use in furnaces having a thermal efficiency of 90 percent or greater and the divestiture of the Draft Inducer Divestiture Assets will remedy the competitive harm alleged in the Complaint.  The

divestiture of the Draft Inducer Divestiture Assets shall be made to an acquirer that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to design, develop, and sell draft inducers for use in furnaces having a thermal efficiency of 90 percent or greater.  The divestiture of the Draft Inducer Divestiture Assets shall be accomplished so as to satisfy the United States, in its sole discretion, that the terms of any agreement between the Acquirer of the Draft Inducer Divestiture Assets and RBC do not give RBC the ability unreasonably to raise that acquirer's costs, to lower that acquirer's efficiency, or otherwise to interfere in the ability of that acquirer to compete effectively.

## V.   **APPOINTMENT OF TRUSTEE**

A.      If RBC has not divested the Pump Motor Divestiture Assets and the Draft Inducer Divestiture Assets within the time period specified in Section IV(A), RBC shall notify the United States of that fact in writing.  Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Pump Motor Divestiture Assets and/or the Draft Inducer Divestiture Assets.

B.      After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Pump Motor Divestiture Assets and/or the Draft Inducer Divestiture Assets. The trustee shall have the power and authority to accomplish the divestitures to acquirers acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate.  Subject to Section V(D) of this Final Judgment, the trustee may hire at the cost and expense of RBC any investment

13

bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestitures.

C.      Defendants shall not object to sales by the trustee on any ground other than the trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the United States and the trustee within ten calendar days after the trustee has provided the notice required under Section VI.

D.      The trustee shall serve at the cost and expense of RBC, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred.  After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to RBC and the trust shall then be terminated.  The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Pump Motor Divestiture Assets and the Draft Inducer Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestitures and the speed with which it is accomplished, but timeliness is paramount.

E.      Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures.  The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial

14

information.  Defendants shall take no action to interfere with or to impede the trustee's

accomplishment of the divestitures.

      F.      After its appointment, the trustee shall file monthly reports with the United States

and the Court setting forth the trustee's efforts to accomplish the divestitures ordered under this

Final Judgment.  To the extent such reports contain information that the trustee deems

confidential, such reports shall not be filed in the public docket of the Court.  Such reports shall

include the name, address, and telephone number of each person who, during the preceding

month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to

acquire, or was contacted or made an inquiry about acquiring, any interest in the Pump Motor

Divestiture Assets and/or the Draft Inducer Divestiture Assets, and shall describe in detail each

contact with any such person.  The trustee shall maintain full records of all efforts made to divest

the Pump Motor Divestiture Assets and/or the Draft Inducer Divestiture Assets.

      G.      If the trustee has not accomplished the divestitures ordered under this Final

Judgment within six months after its appointment, the trustee shall promptly file with the Court a

report setting forth:  (1) the trustee's efforts to accomplish the required divestitures; (2) the

reasons, in the trustee's judgment, why the required divestitures have not been accomplished;

and (3) the trustee's recommendations.  To the extent such reports contain information that the

trustee deems confidential, such reports shall not be filed in the public docket of the Court.  The

trustee shall at the same time furnish such report to the United States, which shall have the right

to make additional recommendations consistent with the purpose of the trust.  The Court

thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final

Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

**VI.**     **NOTICE OF PROPOSED DIVESTITURE**

A.     If the trustee is responsible for effecting either of the divestitures required herein, within two business days following execution of a definitive divestiture agreement, the trustee shall notify the United States of any proposed divestiture required by Section V of this Final Judgment.  The trustee also shall notify RBC.  The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Pump Motor Divestiture Assets and/or the Draft Inducer Divestiture Assets, together with full details of the same.

B.     Within fifteen calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed acquirer(s), any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture(s), the proposed acquirer(s), and any other potential acquirer.  Defendants and the trustee shall furnish any additional information requested within fifteen calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.     Within thirty calendar days after receipt of the notice or within twenty calendar days after the United States has been provided the additional information requested from Defendants, the proposed acquirer(s), any third party, and the trustee, whichever is later, the United States shall provide written notice to RBC and the trustee stating whether or not it objects to any proposed divestiture.  If the United States provides written notice that it does not object,

16

the divestiture(s) may be consummated, subject only to RBC's limited right to object to the sale

under Section V(C) of this Final Judgment.  Absent written notice that the United States does not

object to the proposed acquirer(s) or upon objection by the United States, a divestiture proposed

under Section V shall not be consummated.  Upon objection by RBC under Section V(C), a

divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII.   FINANCING

Defendants shall not finance all or any part of any divestiture made pursuant to Sections

IV or V of this Final Judgment.

## VIII.   HOLD SEPARATE

Until the divestitures required by this Final Judgment have been accomplished,

Defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order

entered by this Court.  Defendants shall take no action that would jeopardize the divestitures

ordered by this Court.

## IX.   COMPLIANCE INSPECTION

A.      For the purposes of determining or securing compliance with this Final Judgment,

or of determining whether the Final Judgment should be modified or vacated, and subject to any

legally recognized privilege, from time to time authorized representatives of the Antitrust

Division, including consultants and other persons retained by the United States, shall, upon

written request of an authorized representative of the Assistant Attorney General in charge of the

Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1)      access during Defendants' office hours to inspect and copy, or at the

option of the Antitrust Division, to require Defendants to provide hard copy or electronic copies

of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

(2)     to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or respond to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.      No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      If, at the time information or documents are furnished by Defendants to the Antitrust Division, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## X.    <u>**NOTIFICATION**</u>

Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), during the term of this Final Judgment, Defendants, without providing advance notification to the Antitrust Division, shall not directly or indirectly acquire any assets of or any interest (including, but not limited to, any financial, security, loan, equity, or management interest) in any entity engaged in the United States in the design, development, production, marketing, servicing, distribution, or sale of electric motors for pool pumps, electric motors for spa pumps, or draft inducers for use in furnaces having a thermal efficiency of 90 percent or greater.

Such notification shall be provided to the Antitrust Division in the same format as, and per the instructions relating to the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information requested in Items 5 through 9 of the instructions must be provided only about electric motors for pool pumps, electric motors for spa pumps, and draft inducers for use in furnaces having a thermal efficiency of 90 percent or greater.  Notification shall be provided at least thirty calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction.  If within the thirty-day period after notification, representatives of the Antitrust Division make a written request for additional information, Defendants shall not consummate the proposed transaction or agreement until thirty calendar days after submitting all such additional

information.  Early termination of the waiting periods in this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder.  This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

## XI.   **NO REACQUISITION**

Defendants may not reacquire any part of the Pump Motor Divestiture Assets or the Draft Inducer Divestiture Assets during the term of this Final Judgment.

## XII.   **RETENTION OF JURISDICTION**

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII.  **EXPIRATION OF FINAL JUDGMENT**

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV.   <u>PUBLIC INTEREST DETERMINATION</u>

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

> Court approval subject to procedures
> of Antitrust Procedures and Penalties
> Act, 15 U.S.C. § 16
>
>
> _____/s/_____
> ELLEN SEGAL HUVELLE
> United States District Judge

Date: November 1, 2011